# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| v. ) | Criminal No.: 2:09-1223-PMD |
| ) | |
| Frederick Lamar McBride, ) | |
| ) | **ORDER** |
| Defendant. ) | |
| _____) | |

This matter is before the court upon Defendant Frederick Lamar McBride's ("Defendant") Motion to Suppress 385 grams of cocaine, $1,500.00, a firearm and all paperwork seized by the Clarendon County Sheriff's Department from Defendant's black Cadillac SLS. Defendant, a convicted felon, is charged in the indictment with possession of a firearm by a convicted felon and possession with intent to distribute cocaine. A hearing was held on this motion on February 24, 2010.

## BACKGROUND

On August 12, 2009, agents of the Clarendon County Sheriff's Office were conducting a narcotics investigation in the area of Summerton on an unrelated case. During the course of the investigation of the unrelated case, Lieutenant Ardis and Agent Kennedy of the Clarendon County Sheriff's Office traveled past the Nu Vibe Club on St. Paul Road in Clarendon County and, while doing so, observed two vehicles outside the club though the officers believed that the club had been closed for months. One of the vehicles in the parking lot of the club was Defendant's black Cadillac SLS, which the officers noticed had paper tags. The officers had previously received information that there were narcotics transactions taking place at this club and that these narcotics transactions involved Hispanic males; however, the officers had no knowledge about the Defendant's connection with this club.

At approximately 6:15 pm, the officers set up surveillance of the Nu Vibe Club. While conducting surveillance, they observed a number of vehicles coming and going from the club, while it was apparently not open for business. From approximately 6:15 pm to 7:20 pm, the officers observed at least four cars come and go from the club; however, the black Cadillac SLS remained in the parking lot the entire time.

At approximately 7:20 pm, the officers observed a blue Ford Explorer pickup truck arrive at the club. The officers observed the driver of the Ford Explorer, a Hispanic male who was subsequently identified as Miguel Cunca, approach a large black male wearing a white T-shirt, subsequently determined to be the Defendant. The Hispanic male and the Defendant then appeared to engage in a short conversation, and they both walked over to the Defendant's black Cadillac SLS. Defendant then opened the rear passenger door of the vehicle, and, very shortly thereafter, the Hispanic male got back into his Ford Explorer and left the area. These observations led the officers, based on the information they had at the time and their training and experience, to believe that a narcotics transaction had taken place.

The officers then observed that the Ford Explorer did not turn on its headlights while it was raining, so the officers followed the Ford Explorer and eventually activated their blue lights when the vehicle turned right onto Bluff Road heading towards I-95. After arresting the driver of the vehicle who was driving without a valid license, a search of the front passenger floorboard of the Ford Explorer revealed a large cloth bag containing what Lieutenant Ardis believed to be around $20,000 in cash but was later counted and determined to be $9,100.00 in cash. After backup officers arrived at the scene of the traffic stop, Lieutenant Ardis and Agent Kennedy went back to the Nu Vibe Club.

At approximately 7:40 pm, Lieutenant Ardis and Agent Kennedy arrived back at the Nu Vibe Club. The officers went inside the club and observed five black males inside. Lieutenant Ardis testified that when he entered the club, he did not see anyone with drinks or food in their hands or on the tables and that it did not appear to him that the place was being operated as a club. The officers asked the men for identification and asked whose vehicles were in the parking lot.[1] The Defendant stated that the black Cadillac SLS was his and also indicated that he operated the club, producing the keys for both from his pocket. Lieutenant Ardis recognized two of the men inside the club from prior narcotic investigations, and Agent Kennedy knew the Defendant and his prior history of drug trafficking activity. The officers then told all the men that they were free to leave but that their vehicles could not leave until a canine unit arrived. Thereafter, the Defendant indicated that he was leaving and gave the keys to the club to another individual, Gary Green. At this point, the Defendant also became very anxious and nervous and was sweating profusely. The Government also claims that at this point the Defendant changed his story and indicated that he did not drive the black Cadillac and did not know whose vehicle it was. Defendant then left the club, walking north on Highway 301 towards Summerton.

Just before 8:00 pm, Florence County Sheriff's Office's Sergeant Scott Brown was contacted and was requested to respond to the club with his narcotics dog. The Clarendon County Sheriff's Office does not have a narcotics detection dog and contacted the Florence County Sheriff's Office as they had used their canine dogs in the past. At the time Sergeant Brown was contacted, he was off-duty shopping and had to return home to change into his uniform and retrieve his dog. Sergeant Brown was also located approximately 60 miles from the

---

[1] Around this time Agent Kennedy walked back outside the club. While outside the Nu Vibe Club, Agent Kennedy heard a champagne colored Cadillac Escalade running while parked in the parking lot. Agent Kennedy attempted to knock on the driver's side window because he could not see inside through the dark tinted window. When he opened the door, he observed a black male (Antoine Lowery) sitting in the passenger's side front seat. His left arm was resting on the center console with cash protruding around the edge. Agent Kennedy had Lowery exit the vehicle. Lowery told the officers the money inside the console was his and that it was around $8,000.

Nu Vibe Club. While the officers awaited the arrival of Sergeant Brown and his dog, they contacted Chief Magistrate Harvin of Clarendon County to let him know that they may need search warrants issued later that night. Also before the drug dog unit arrived, officers looked through the Defendant's vehicle's windows with a flashlight and saw and took photographs of rolls of cash and packages wrapped in foil in the back seat. The drug dog unit arrived at approximately 8:55 pm, and after the dog alerted on the black Cadillac, Agent Donnie Drose prepared the search warrant and went to Chief Magistrate Percy Harvin. Agent Drose, while under oath, reiterated information including the stop of the Ford Explorer with the Hispanic males with a large amount of cash, the cash in a champagne colored Cadillac also located at the club, and the observations made by Lieutenant Ardis and Agent Kennedy during surveillance at the club. As a result, Chief Magistrate Harvin signed a search warrant for the black Cadillac SLS, a cream colored Cadillac Escalade, and the Nu Vibe Club.

At approximately 10:30 pm, officers executed the search warrants. Inside the black Cadillac SLS, they found $1,500.00, 373.85 grams of cocaine in plastic bags wrapped in aluminum foil, a loaded Highpoint 9 mm handgun, and Defendant's driver's license.

## **ANALYSIS**

In this case, the Defendant's black Cadillac SLS was seized just before 8:00 pm when officers told the Defendant that he was free to leave but that his vehicle in the club's parking lot could not leave until a canine unit arrived. The United States Supreme Court has recognized that it is permissible to detain an individual and search their person based on less than probable cause provided an officer has reasonable, articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1 (1968). The reasonable, articulable suspicion standard has been expanded to the brief detention of personal property. *United States v. Place,* 462 U.S. 696 (1983) (applying

*Terry* to the investigatory seizure of luggage). However, in addition to being supported by reasonable, articulable suspicion, an investigatory seizure must also meet *Terry*'s brevity requirement. In analyzing a *Terry*-stop, the intrusiveness of the stop is the "critical threshold issue." *United States v. Alpert*, 816 F.2d 958 (4th Cir. 1987) (citing *Place*, 462 U.S. at 722). "The duration or brevity of the stop is a key consideration in determining its intrusiveness." *Id.*

In this case, then, the legality of the seizure of the Defendant's black Cadillac SLS turns upon two questions: **(1)** whether law enforcement had a reasonable articulable suspicion that Defendant's vehicle contained contraband, and **(2)** whether the approximate delay of 55 minutes before the narcotics detection dog arrived and positively alerted to Defendant's vehicle was reasonable under the circumstances.

1. **Reasonable Suspicion**

The Defendant argues that the seizure of his vehicle was not supported by reasonable, articulable suspicion that criminal activity was afoot. The presence of reasonable suspicion depends upon the "totality of the circumstances," including the information known to the officer and any reasonable inferences which can be drawn at the time of the stop. *United States v. Arvizu,* 534 U.S. 266 (2002). Additionally, the same standard of reasonable suspicion that applies to the investigative stop of a person also applies to the brief investigative detention of personal property. *Place,* 462 U.S. at 706-08.

The Defendant claims that, viewed in the totality of the circumstances, the facts do not establish reasonable suspicion necessary to support the seizure of the Defendant's black Cadillac SLS. While conducting surveillance of the night club, the officers observed a number of vehicles coming and going from the club, which the Defendant argues is normal activity for a night club. Then the officers observed a Hispanic male talking with the Defendant by the

Defendant's black Cadillac and observed the Defendant opening the rear passenger door of the Cadillac. The Defendant argues that this activity is also consistent with normal activity in a parking lot and that, for example, "one can easily imagine an innocent conversation dealing with a sound system in the automobile or some other feature of the automobile." The Defendant notes that the officers did not see any exchange between the Hispanic male or the Defendant and that the officers did not report seeing the Hispanic male with a package when he walked to the black Cadillac or when he returned to his pickup truck. Finally, the Defendant argues that none of the facts concerning the cash found in the Hispanic male's Ford Explorer or the cash found in the champagne Cadillac outside the club have any connection to the Defendant or his black Cadillac SLS.

The Government argues that the facts leading up to the seizure of the Defendant's vehicle establish reasonable and articulable suspicion that the Defendant's vehicle contained contraband. Specifically, the Government notes that the agents had information that drug trafficking activity was occurring at the club, agents witnessed what appeared to be a drug transaction between the Defendant and the Hispanic male involving the Defendant's vehicle, and agents discovered $9,100 in cash in the Hispanic male's car immediately after witnessing the Hispanic male and the Defendant's interaction at the club. The Government argues that these facts, considered together, created a reasonable, articulable suspicion that drug activity was afoot at the club and, more specifically, that the activity involved Defendant and his car.

The Court finds that, viewed in the totality of the circumstances, the officers had a reasonable and articulable suspicion that the Defendant's black Cadillac SLS contained contraband and that criminal activity was afoot. The following events took place before the officers seized the Defendant's vehicle: (1) the officers viewed two vehicles parked outside of a

club that the officers believed to have been closed for months; (2) the officers had prior knowledge that drug transactions occurred at the club and that these transactions involved Hispanics; (3) while conducting surveillance of the club, the officers saw multiple cars come and go from the club within a short time period and at a early time of the evening for a night club; (4) the officers witnessed a transaction between a Hispanic male and the Defendant that, based on their prior law enforcement experience, seemed to be a drug transaction and that eventually resulted in the officers finding $9,100.00 in cash in the Hispanic male's car; (5) the Officers found a champagne Cadillac in the parking lot of the club that contained around $8,000.00 in cash in the center console; (6) when the officers entered the club, they found that none of the occupants were engaged in normal activities associated with night clubs such as eating and drinking; (7) the officers knew that several people present in the club were involved in prior drug trafficking activity and knew, specifically, that the Defendant had been involved in prior drug trafficking activity; and (8) after the Defendant waived his keys to the officers and stated that the black Cadillac car was his, the officers knew specifically that the black Cadillac car belonged to the Defendant. Therefore, the Court finds that under the circumstances as described above, the officers possessed reasonable and articulable suspicion that the Defendant's vehicle contained contraband, therefore allowing the officers to legally detain the Defendant's vehicle for investigatory purposes.

### 2. **Reasonable Duration of the Investigative Detention**

The Defendant argues that even if the initial seizure was supported by reasonable suspicion, the seizure of the Defendant's black Cadillac for approximately 55 minutes to allow for the arrival of a drug dog was unreasonable. The Defendant argues that the officers could have called the Florence County drug dog officer as soon as they stopped the Hispanic male and

found $9,100 of cash in his car instead of waiting until shortly before 8:00 pm to call for the drug dog after arriving back at the club. The Defendant argues that there were numerous opportunities to call the drug dogs so that the Defendant did not have to be deprived of his vehicle for approximately 55 minutes.

The Government argues that the officers did not unnecessarily prolong the investigatory detention of the Defendant's vehicle. The Government argues that as soon as the Officers returned to the Nu Vibe Club after stopping the Hispanic man, they immediately made arrangements to have the drug dog come to the scene. Additionally, the Government argues that the agents did not have the luxury of calling on a canine unit in their own department, as they did not have one, but instead were forced to contact Florence County Sheriff's Office. When contacted, Sergeant Brown, who was off-duty, quickly went to his home, changed his clothes, retrieved his narcotics dog, and arrived on scene in approximately 55 minutes. The Government argues that this length of time was reasonable under the circumstances, that the officers were diligent, and that the detention of the vehicle was not unnecessarily prolonged.

The Court finds that the approximately 55-minute detention of the vehicle while awaiting the arrival of the drug dog unit was reasonable under the circumstances of this case. As mentioned above, when analyzing a *Terry* detention, the intrusiveness of the detention is the "critical threshold issue." *Place,* 462 U.S. at 722. "The duration or brevity of [a] stop is a key consideration in determining its intrusiveness." *United States v. Alpert*, 816 F.2d 958, 961 (4th Cir. 1987). Among the circumstances which must be considered when analyzing the intrusiveness of the detention are the duration of the time the suspect is delayed by the stop; whether the police acted diligently; whether the detention of the subject of the search was unnecessarily prolonged; whether the authorities make it absolutely clear that they plan to reunite

the suspect and his possessions at some future time, and how they plan to do it; and the importance of the governmental interest alleged to justify the intrusion. *Id.* at 964.

In *United States v. Alpert*, the Fourth Circuit Court of Appeals held that a 50 minute detention of luggage while awaiting the arrival of a K-9 unit did not exceed the time limits of a *Terry*-stop. 816 F.2d 958 (1987). The Court of Appeals first noted that in *United States v. Place*, 462 U.S. 696 (1983), the United States Supreme Court held that the 90-minute detention of Place's luggage while awaiting the arrival of a drug dog exceeded the permissible limits of a *Terry*-stop, and hence became a seizure without probable cause in violation of the Fourth Amendment. *Id.* at 962. In *Place,* the Supreme Court refused to set a maximum time limit on investigative stops but held that in that case the police had unnecessarily prolonged the stop, since the agents knew of Place's arrival in time to arrange for a more prompt investigation. *Id.* In so doing, the *Place* court said that "in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." *Id.* (citing *Place,* 462 U.S. at 709.

The Fourth Circuit Court of Appeals then went on to analyze *United States v. Sharpe*, 470 U.S. 675 (1985), where the Supreme Court found that under the circumstances a 20-minute detention did not violate the brevity requirement of an investigative stop. *Id.* at 963. The Fourth Circuit noted that the *Sharpe* opinion emphasized the reasoning in *Place* that identified police diligence as a factor in assessing the reasonableness of a stop's duration. *Id.*

Finally, the Fourth Circuit Court of Appeals analyzed the 50-minute detention of luggage awaiting the arrival of a drug dog at issue in the case, a duration that appeared to come somewhere in between *Place* and *Sharpe*. *Id.* The Court noted that the officers took steps to see that the stop was no more intrusive to Alpert than necessary including making arrangements to

return Alpert's luggage if he did not wish to stay and observe the sniff test. *Id.* at 964. In addition, the Court noted that the Police had to take the luggage to the Police Academy for the sniff test and that the Court would not require a *per se* rule that police keep their narcotics dogs at the airport. *Id.* The Court also noted that the police did not interfere with Alpert's movements at all, for Alpert continued on his way, unmolested except for the taking of his suitcase. *Id.* Based on the above factors, the Fourth Circuit Court of Appeals concluded that the duration of the time involved between the time the suitcase was taken and the time the narcotics dog alerted, 50 minutes, was no longer than the circumstances of the case required. *Id.*

In this case, the Court finds that the duration of the time involved between the time the officers told the Defendant that he would have to leave his vehicle at the club and the time the narcotics dog alerted, approximately 55 minutes, was no longer than the circumstances of the case required. All of the facts indicate that the police acted diligently. The police called for the K-9 unit at approximately 8:00 pm and almost immediately upon returning to the club after performing the traffic stop of the Hispanic male. The detention of the vehicle was also not unnecessarily prolonged. The Clarendon County Sheriff's Department did not have a K-9 unit, and the officers' only access to a K-9 unit was an off-duty unit in Florence, approximately 60 miles away. As soon as the officers requested the unit, Sergeant Brown, who was off duty, quickly went to his home, changed clothes, retrieved the dog, and arrived on the scene in approximately 55 minutes. Also, the officers did not interfere with the Defendant's movements at all as they let the Defendant leave and did not require him to wait around for the K-9 unit to arrive. Lastly, while in this case the officers did not make any arrangements to reunite the Defendant with his vehicle, a factor that can heighten the intrusiveness of an investigatory stop according to *Alpert*, in this case unlike in *Alpert*, the Defendant owned the club and most likely

knew where the car would be once he left the club.  Therefore, under the circumstances of this case, the officers did not unnecessarily prolong the detention of Defendant's vehicle and, therefore, did not exceed *Terry*'s brevity requirement.

## **CONCLUSION**

Based on the foregoing, the court **DENIES** Defendant Frederick Lamar McBride's motion to suppress.

**AND IT IS SO ORDERED.**

_____
PATRICK MICHAEL DUFFY
United States District Judge

**March 1, 2010**
**Charleston, SC**